O.E.A. O.E.A. O.E.A. All churches have an instance before the Honorable, the United States Court of Appeals, for the District of Columbia Circus, to partner with John Muir and give their case before the courts of New York City. God save the United States and an Honorable Court. Case number 18-5032. John Doe v. James Mattis and his official capacity as Secretary of Defense appellate. Mr. Berman for the appellate. Mr. Hafford for the appellate. So I have two announcements before we start. The first is Judge Henderson will give full consideration to this matter based on the briefing that's been submitted by the parties and the audio recording of the argument we have today. And the second announcement is that we'll have a public session, which we're about to embark upon now, in which there'll be no reference made to the sealed material, which is the identity of the two potential receiving countries, as was discussed in the public briefing, or any discussion that could reveal the identity of those countries. And then we'll retire into a closed session in which those references can be made. With that, Mr. Burnham. Thank you, Your Honor. My name is James Burnham. I'm here on behalf of the United States. And, Your Honor, I want to thank the panel for bifurcating the argument, and as a result, I'll begin with the broad legal issue and try to defer the discussion of the countries to the sealed proceeding. Petitioner, in this case, is a citizen of both the United States and Saudi Arabia who chose to travel to ISIL-held territories spanning Syria and Iraq, where he was captured on a battlefield by the Syrian Democratic Forces. Petitioner told those forces that he is a U.S. citizen, and they transferred him to U.S. forces, which now seek to potentially transfer Petitioner again. Those efforts are hindered, however, by a sweeping injunction that requires 72 hours' notice to the district court before relinquishing custody of Petitioner to any country. The government has come to this court seeking the narrowest possible relief from that injunction that can still protect its critical interests in conducting foreign affairs and in military operations. How is an injunction that requires notice a sweeping injunction? The reason why the notice requirement is an issue is because it interferes with that process. And I think, as Petitioner himself recognizes, and Canva II, I think, holds, there cannot be a notice requirement unless there's authority to enjoin the underlying transfer. Did you argue below that, to the extent that they're seeking notice, it should only be with respect to certain countries and not others? And wasn't your position below a sweeping position in that the executive could transfer him to any country in the world without any judicial review? No, Your Honor. Our position in the district court was that the executive could transfer him to a country that has a legitimate interest in obtaining custody. And we identified one country in the district court below that we can talk about more in the sealed proceeding, but our legal rule was the same legal rule we're talking about here, which is that there needs to be a direct and legitimate interest on the part of the receiving country in order for the transfer to be allowed. And so what we asked the district court to do was to not include – now, it's a little complicated because the petitioner asked for a transfer injunction, not a notice injunction. So most of the briefing and discussion was focused on an injunction against the ultimate transfer. But what we asked the district court to do was exclude a country that has a – any country that has a legitimate interest in Petitioner, in particular one country that we can talk about. And so I think we fairly presented our narrow position to the district court. In this court, we've tried to narrow it even further and concretize it more by limiting it to the two countries that we're going to talk about. And I think it's relatively clear that the court cannot enjoin transfer to either of those countries here. The United – is one that the government has without any judicial review of the legality of the authority to transfer? So I would disagree with your premise, Judge Shrinivasan, because as I read that passage in Omar, there's no commas in the passage. And so what the court, I think, was saying is you cannot detain and transfer Americans or individuals in U.S. territory at will. So suppose – I think I know where you're going, which is that in U.S. territory ratifies both Americans and individuals.  And I understand your submission to that effect. Let's just assume for present purposes that we disagree with you on that and that they're disjunctive and that Americans wherever and others in U.S. territory. So if that's the understanding, then what's your position as to that? Is your position just that that's wrong and it's not correct, or is it that notwithstanding – No, no. I mean, we're still in compliance. No, no. I think even if that is what Omar meant and that is the law, that the United States still has the authority to transfer a petitioner. And I think it's the same authority, Article II authority, that the executive uses every day on the battlefield to engage in all kinds of battlefield operations – troop movements, military operations, establishing local bases, all of that. There are lots of things that happen on the battlefield without any kind of judicial review that the executive just has the authority delegated to the military commanders to engage in. It happens. You just – you throw in without any judicial review. And I guess my question is if the statement says – and let's just – it lives out in U.S. territory because obviously I'm in a different way. Right. And I understand you've got your caveat that that's wrong. Right. But none of this means that the executive branch may detain or transfer Americans without any judicial review of the positive legal authority for the transfer. So that's what it says. And how is the without judicial review consistent with a statement that says that judicial review is required? So, Your Honor, I think that the position that we would – what we would say is that there's no judicial review of the legal authority portion of what is going on. But I don't know that our position is that different as a practical matter because what we're saying is that the executive can only send somebody to a country with a legitimate interest. And I think that there could be a role for the court to play in deciding kind of what the scope of a legitimate interest is. And so I think that's a place where the court might have a role to play. I don't think the court has a role to play in assessing whether the legitimate interest as defined exists as a matter of fact in a particular case. And so the analogy I would draw there is to the unreviewability of whether somebody is going to be – or likely to be tortured in a receiving country, where the executive branch and Congress have – they're the political branches. And so the executive's determination that someone's not likely to be tortured is just not reviewable, at least not in the main. I mean, maybe at the extremes, but not in the sort of normal case. So the type of question I'd ask then is in Minov, the legal question was whether a country that has a particular interest, which is to say an interest in prosecuting – potentially prosecuting someone for potential crimes committed within their territory, is the type of interest that – as to which transfer is definitely allowed and therefore unreviewable. You'd say the same thing about transfer based on some other source of authority by the receiving country. I won't get into particulars, but in terms of if it's not transfer for purposes of enabling prosecution for crimes within territory, but it's some other legal basis for the transfer, the validity of that legal basis would be something that's subject to judicial review. Right. So I think it is certainly possible that the courts have a role to play in assessing whether that legal basis is the sort of legal basis that Minov was talking about. So we've tried to extrapolate from Minov a legal principle that there's a certain basket of interest that – at least that basket of interest is sufficient to engage in a transfer like the one we're talking about here. It could be that there's a much broader authority, but we don't think that the court needs to get into that in this case because the countries we've proffered are so close to what was going on in Minov. And the legal question, whether that basket of interest is enough, is one as to which there would be judicial review. So I disagree that it would be something that is subject to judicial review because I think we disagree with Your Honor about what Omar says. But if Omar disagrees with me about what Omar says, then I think that the judicial review would be limited to what we've just discussed, which is whether that interest is a legitimate interest as we conceive it under Minov. And then also, of course, under Kiemba, which I think Kiemba is written in a sort of much more categorical way than the Supreme Court's decision in Minov. And just to underscore that, I mean, there's a lot of quotes like this in this court's opinion in Kiemba, Kiemba 2, I should say. Quote, Minov precludes a court from issuing a writ of habeas corpus to prevent a transfer, end quote, because of either continued detention or torture. And so I think what we read from that is if the court cannot enjoin the transfer even to prevent continued detention, it can't enjoin the transfer for no reason at all just because the petitioner doesn't want to go to whatever country is at stake. And then the primary distinction that's been offered for Kiemba 2 by petitioners is that it didn't involve U.S. citizens, which is true, except that this court said in footnote 4 that it was assuming, quote, arguendo, these alien detainees have the same constitutional rights with respect to their proposed transfer, as did the U.S. citizens facing transfer. Right. But in Kiemba, I thought what was principally at stake is conditions in the receiving country. And so I think you're right that the footnote in Kiemba deals assumes that the individuals there have the same rights as U.S. citizens would with respect to challenging transfer based on conditions in the receiving country. And if the challenge doesn't have to do with conditions in the receiving country, in other words, if the challenge isn't – the detainee isn't saying here's why I've got to transfer because the conditions in the receiving country are X, Y, Z, which I'm sure might be one of them, there could be other things, doesn't comply with the laws that we hold to be fundamental here, things of that nature, then that's not something that can be reviewed, which might be a different claim than a challenge that's based on the authority to detain here to begin. Right. So I just don't think Kiemba is written solely focused on the conditions in the receiving country because I wouldn't conceive of continued detention under that country's laws as a condition in the receiving country. I think that's a reason why the person doesn't want to go there. And so just, you know, Kiemba says in another place that the district court cannot issue a writ of habeas corpus to shield a detainee from, quote, detention at the hands of another sovereign on its soil and under its authority. And that's at page 516 of this court's opinion. And so I think what the court was saying there is that even if the petitioner is concerned about continued detention, which I don't think is a condition, I think that's more – he's worried about – I think about that as in a different box than whether he's likely to be tortured. It's just a rationale for not wanting to go to whatever country we would like to transfer him to. Even then, the court cannot interpose itself by a habeas. And so I think when you read that in conjunction with Munaf, it's clear that the executive has very broad discretion in this area, at least under the circumstances at issue here. And just to take through them really quickly, because – So if someone who is a journalist for MSNBC or CNN or something like that is detained on the battlefield and the executive makes a determination that they're an enemy combatant and they're going to transfer them forthwith to Siberia or some other remote, unpleasant location, and they file a writ of habeas corpus in the district court here, the court would be without jurisdiction or without the power to review that detention or that transfer. Well, Your Honor, I don't think we need to – that's really not our position in this case, because that's different from this case in several, I think, significant respects. For one thing, I think – I understand it's different. No, I – that's fine. But my point is, is it your argument that that would be unreviewable? No, Your Honor. My argument today is that I think the court could play a role potentially in defining the scope of what is a legitimate interest as a legal matter. And so it's hard for me – I think there would be a very difficult question about whether there would be a legitimate interest – I don't know if the citizenship of the journalist, Your Honor, is hypothesized. U.S. citizen. Well, no, I assume that, but I don't know if he's also a citizen of Russia. That could change the calculus. But assuming he's not, and assuming this is just, you know, we've picked a country out of a hat, I think that would be a much more difficult case. But I thought – I thought, just to follow up on Judge Wilkins' question – Judge Wilkins' question, sorry – I thought that your threshold position was, if you disagree with the gloss on Omar that I asked you to accept, and you think that it means that it only deals with people detained in U.S. territory, even if they're American citizens, then why isn't the answer to Judge Wilkins' question that there isn't a tradition? I think these are just slightly different concepts. So the point in Omar was what sort of legal authority, in the sense of, like, Valentine means it, I think, in the extradition sense, the executive needs. And I don't think that applies here. I think Omar was not saying that, and I think Munoz takes that off the table. What I took Judge Wilkins to be asking me is whether there is a limit on the discretion that we're talking about, a judicially reviewable limit. And I think if you read Munoz, you know, we don't have a firm position on the outer bounds of this authority, but I certainly think in the hypothetical you've offered, it's a much more difficult case because I think there could be a real question about whether that country has a legitimate interest. I would also note that on the sort of our side of the equation, you know, there are a lot of circumstances – I'm just – I'm sorry. Please. There's two different things going on here, one of which is whether there's legal authority, and the second of which whether the question of whether there's legal authority is judicially reviewable. And so it sounds like what you're saying is that based on Judge Wilkins' hypo, there would be a serious question about legal authority. But as to judicial reviewability, what's your position? So, Your Honor, I guess I just – I don't mean to be disagreeable. I just don't think about it as a legal authority issue because I think legal authority is a concept from the extradition context that just doesn't apply here. There has to be a treaty with Country A in order to extradite somebody to Country A, and I don't think that apparatus applies. So if there's no legal authority requirement then, and let's suppose that's the – if we're going to operate under that premise, then what role is there for the courts in my hypothetical? So I think, Your Honor, there could be – there could nonetheless be limits on the executive's power. So even if there's not a legal authority requirement, in the sense that Judge Srinivasan has suggested Omar says and that I think Ballantyne does say for extradition, there could be limits to the scope of executive power. And so it could be in that circumstance that that is just so – that country is just so far flung, there's no basis in international law, there's no basis in really any legitimate basis for that country to be receiving petitioners, that the executive just doesn't have discretion to do that. And let me ask a semantic question then. Maybe we're fixated on the term legal authority. Right. Because I understand that that might raise some red flags in your view about Ballantyne. But the way Omar discusses it is it goes on in the same paragraph to explain why the concern that it raised at the outset of the paragraph was satisfied by the proceedings in Munaf. And what it says is, in the earlier iteration of this litigation, Omar raised the habeas argument that the government lacks constitutional or statutory authority to transfer him to Iraqi authorities. The Supreme Court addressed Omar's argument and determined that the executive branch had the affirmative authority to transfer Omar. So if we discuss it in terms of affirmative authority rather than legal authority, then are we on the same page? Yeah, I think so, Judge from New Boston. I think what Munaf is saying is that the executive branch just has the authority to do this. And I don't think Munaf – and the court, of course, does not do this in Munaf – isn't going through the U.S. Code or our nation's treaties to try to find something more specific than just the general authority that the executive has over the battlefield. But just if I may – I know I'm over time – but to answer Judge Wilkins' hypothetical, the other thing I would like to stress is basically all the same predicate circumstances exist in this case as existed in Munaf. So we've got – and I think some of these will apply in your hypothetical, but not all of them. We have someone who voluntarily traveled to an active theater of combat, was captured on a battlefield, was turned over to the U.S. military during active hostilities, was being held by the military in that theater of combat. And then I think this is an important one. Pursuant to the military's good faith determination that he's an enemy combatant. And then I would also note that there's ongoing hostilities in the region. And so I think it would be – I mean, it's hard for me to imagine that if the United States believed the person was an innocent CNN journalist who hadn't engaged in acts of terrorism or participated in that sort of thing, that they would – that we would ever transfer him to Siberia or any other country Your Honor has suggested. I also certainly – You said good faith belief that he's an enemy combatant, but I thought – Determination. Sorry. Good faith determination. Yeah, good faith determination that he's an enemy combatant. But I thought the position you were taking in the reply brief was that the enemy combatant's determination didn't matter. So what I think we – what I meant – what we meant to say in the reply brief, Judge Robotson, was – or what I was trying to say is that there's no judicial review of his status as an enemy combatant. But that's not to say that – you know, I think it would be entirely reasonable for this court were it to agree with our narrow position in this case to say that part of the reason it's doing so is because the executive has made a good faith determination that he's an enemy combatant. I don't think the court needs to try to decide what would happen in a case where, you know, we haven't determined the person's an enemy combatant, where they are just an innocent CNN journalist or something like that, because I think that matters. And I think that's another reason in which – another aspect in which we are very similar to Munaf, because in Munaf the executive had determined on its – through its own process that the petitioners were enemy combatants, but there had been no judicial testing of that. And there had been no judicial testing of that, even though they were very adamant that they were innocent people. I mean, the petitioners in Munaf said that they were just innocent translators who'd been caught up in, you know, this thing, and there was no basis to prosecute them, and they were Americans. I mean, many of the same claims that have been raised here. And I think the Supreme Court was very clear that those petitioners did not have a right to any U.S. judicial review of their status before they were transferred to the Iraqis. And I think our case is similar. So that, I think, is a very important question about Munaf. So I think, as I read Munaf, you're correct that the detainees in Munaf were making the claim that they couldn't lawfully be detained because they were innocent civilians. And it seems to me the Supreme Court didn't treat with that at all, and that's the basis of your submission, that in that case, if that's true, then the same should be true here. And courts shouldn't treat with the validity of the basis for the detention to begin with. We can still address transfer without dealing with that. But the other part of Munaf is that it's one way to read Munaf is that the Supreme Court actually did sign off on the legality of the detention, but not based on enemy combatants. What the Supreme Court said was that this detention is a detention for purposes of criminal proceedings to take place in Iraq, which is something as to which a sovereign always has authority. And so what was going on is this person's being detained in concert with the Iraqi authorities under the traditional function of sovereigns, which is to hold people for potential prosecution based on crimes within their territory. And so it's one way to read Munaf is to say the court didn't have to treat with whether the enemy combatants was a valid basis for detention because there was another basis for detention, which is holding off from criminal proceedings. That's tried and true. That's fine. That exists. So we get past the detention question and we go to transfer. Your Honor, I don't disagree that that could be a reading of Munaf. I just don't think it's the reading of Munaf this Court adopted in Kiemba II, where it applied Munaf much more broadly to a much wider range of circumstances than pending criminal proceedings in another country. And so I think that Kiemba II takes a fairly broad view of Munaf. And I also think we should – we can talk about this more easily in the closed session. I think there are also – another answer to Your Honor's point is that I think there are other interests that are very close to what Your Honor has – to a criminal prosecutorial interest that I think are very analogous and that are present here. But what about the fact that Doe or in my hypothetical the reporter or the person who alleges that they're only acting as a reporter and not as an enemy combatant is a U.S. citizen? Aren't there collateral consequences to there having been a designation that they are an enemy combatant? So let's suppose we vacate this injunction and Doe is transferred wherever. And then Doe seeks to return to the U.S. There's a finding that's been made that he's an enemy combatant that he wasn't able to challenge. Shouldn't that concern us as far as whether his habeas petition is moot, as in a scene? Or what do we do with that? That's just life in the big city. That's just tough. He's got that designation. So, Your Honor, let's say we did transfer Doe. I think then the government would have to file a petition – I'm sorry, not petition – a motion in the district court to dismiss the case as moot. And I think that would be the proceeding in which the concerns Your Honor has suggested would be litigated. So I think if there were, in fact, collateral consequences, or at least a petitioner thought there were, he could raise those in opposition to dismissal of his habeas petition, and then we could litigate that. Now, I obviously will – I'm sure we will take the position as we have, and as this court, I think, has agreed with us in some cases, including Doe, that there are no collateral consequences sufficient to keep the proceeding alive once the person has been released from U.S. custody. But I don't think this court needs to confront that now because we're not asking you to dismiss his petition. We're just asking the court to lift the transfer – the notice injunction as to the two countries. And then we can, if we're able to, we'll – if the other countries decide that they'd like to take him, they'll transfer him, and then there will be, I'm sure, or at least potentially, litigation in the district court that will come back to this court about whether that transfer has, in fact, mooted his petition. So I think, Your Honor – I mean, if those are concerns Your Honor has, I think we can discuss those later in the proceeding. But aren't those concerns materially different in a case where we're dealing with a U.S. citizen who has a right to return than in Munoz or Kiyimba? Right. So I don't have a – the answer is they certainly could be, but I don't have a firm position on behalf of the United States about that yet because I just don't think we're at that point. I think the issues Your Honor has raised would go to whether the case becomes moot following a transfer, and I think that's something that we – But don't they also – don't those issues also go to whether it's appropriate for the court to review his status as an enemy combatant if that is challenged? So I guess I would separate the concepts. So I think there's the question of whether the court should review his possible transfer to the two countries we're talking about, in which case we don't think the court – I mean, we think we've made a facially sufficient showing, and we have the authority to execute those transfers without judicial oversight. There's a second question of whether the court has habeas jurisdiction to review the merits of his claim, that we have no legal or factual basis to detain him. I – the district court has suggested, petitioner has suggested, and I'm confident that we believe, if he is transferred out of U.S. custody, that would end his habeas proceeding because the point of the habeas proceeding is to challenge that custody. It's entirely possible that he could say there are some other collateral consequences because he's an American that keep it alive, that keep it from being moot, and I just think that's something we can really assess. So let me make sure I understand your position. Is it your position that whether or not he is an enemy combatant has no legal impact or effect at all on the executive's ability to transfer him? So if he's not an enemy combatant, the executive can transfer him to any state that has some sort of legitimate sovereign interest in him, just the same as if he is an enemy combatant. The difference in status has no impact on the executive's authority. So not quite. The way I think I would think about it, Judge Wilkins, is, you know, in this case, our position is that one of the things this court can and should – is welcome to rely on and I think could rely on in ruling for us is that we have made a good-faith determination just as in Munaf that the petitioner is an enemy combatant, but I think it is very clear from Munaf that the court – there's no right to judicial review of that status before the transfer is effectuated, and I think that just makes sense. I mean, it cannot be that he's entitled to a full round of habeas review before the executive is able to relinquish custody of him to another country. Is due process always situational, though? I mean, you know, you can have, you know, due process without having a full-blown jury trial and discovery and all of that. I mean, you know, even in a criminal case, when somebody is first detained, perhaps under Gerstein v. Pew, you know, all the government has to do is present some sort of sworn affidavit of probable cause that can at least be examined in court, and then if the detention is going to go longer than that, then maybe it's a preliminary hearing where they have to produce a live witness and there's some cross-examination. And then if they want to convict him and hold him for, you know, a term of years under sentence, then you've got to have a full panoply of rights of a trial. But you're saying that, you know, here it's all or nothing. Either there's no process or it's a full-blown trial which is unworkable. Why is that the right way to look at due process? Well, Your Honor, I just think that's how the Supreme Court looked at it in Munaf. And so that's all. We're just echoing what the Supreme Court said in Munaf, where there were none of these judicial proceedings about the factual accuracy of the executive's determination that those petitioners were enemy combatants. So I wonder if in Munaf it's because there was no determination of whether the individuals, in fact, were enemy combatants. But that's because, as you and I were discussing earlier, there was a determination of the legality of the detention. It was just that the detention followed from a different source of authority, which is the authority to detain pending prosecution. And if that's – let's just assume that that's the way Munaf worked through that issue. If that's true, then the Munaf litigation did have a determination of the legality of detention. It's just that the detention was legal, was authorized for some other reason for holding over for prosecution, and the Supreme Court validated that, and there was no reason to look at that again once the Supreme Court did. So I just don't think that's what – that's really not how the detainees in Munaf conceived their claims. I think they conceived their claims as being vis-a-vis U.S. detention, and the Supreme Court said there was jurisdiction to consider whether they had a basis for release vis-a-vis the United States. I think that's a very tricky question, whether – because I think what your – the result of what your honor had suggested, I think, would be that the U.S. could engage in detention as long as the Iraqi criminal proceedings were ongoing. And I don't know that that's – I don't think that's what the Supreme Court meant. I think what the Supreme Court was saying was that we could give – we could relinquish these people to the Iraqi criminal justice system. I don't think it was saying that the basis for detention was not their status as enemy combatants, but was this kind of a post-Gerstein pre-conviction incident-to-criminal-proceeding source of authority based on Iraqi law. That's just not how I read the case. So here's what – here's what it now says at 697 to 698. Moreover, because Muammar bin Abd al-Baghdadi, held by the United States Armed Forces at the behest of the Iraqi government, pending their prosecution in Iraqi courts, release of any kind would interfere with the sovereign authority of Iraq to punish offenses against his laws committed within its borders. And so it seems like the court was looking at the detention by U.S. forces in concert with Iraq and was validating it because the nature of the detention was in anticipation of Iraq's sovereign authority to prosecute. So I don't – I mean, I obviously don't dispute that that's in the court's opinion and they talked about that. I just don't think that – I don't think the court was sort of – was moving the basis for detention from enemy combatant authority to anticipatory of legal proceedings, especially because I think in that case, the U.S. was trying to relinquish custody of these individuals to the Iraqi criminal justice system right then. I think it would have been a pretty different – it would have been a different case and maybe – Well, I'm not understanding the significance of that point. Why does it matter? Well, because the question before the court was whether the United States could relinquish custody of them to the Iraqi justice system at that time. And so I just don't know what the court would have said, and I think it would be a different case if the U.S. had come in and said, no, we want to keep holding them in U.S. custody for as long as it takes for the Iraqi criminal justice system to reach the final – the point of final conviction or final acquittal. And I just don't think that was what the court had in mind and what the parties were talking about in that case. This gets to one other issue that I wanted to explore, which is the relationship between the authority to transfer and the authority to detain. Sure. So one way to look at the world, and I think the way your colleagues on the other side look at the world, is the authority to transfer presupposes an authority to detain, especially if it's transferred to a third country, because in order to transfer someone to a third country, you have to detain them and then move them. And as I understand the way you look at the world, it's a little bit different, which is that you don't have to think about authority to detain at all if you're talking about authority to transfer. They're two kind of disaggregated, separate things, and all we're looking at is authority to transfer. And my question to you is why? Because there is some logical force to the intuition that in order to be able to transfer someone to a different country, there needs to be an authority. In order for the U.S. to have the authority to transfer someone to a different country, there needs to be an authority to detain that person to begin with in order to facilitate the transfer. Right. So I think it just looks at it from the wrong side of the equation, because when you transfer somebody to a foreign country, you are by definition relinquishing them from U.S. custody. So it's sort of odd to say the U.S. needs authority to detain in order to cease its detention and relinquish custody of someone to a foreign country. And the way I would think about it, and I think we've talked about this at some length in our briefs, is when petitioner travels to a transnational battlefield that spans Syria and Iraq, and let's just say hypothetically the Iraqi government wanted to take custody of that petitioner while he's there, there would be nothing in U.S. law to prevent that. His only remedies in the United States would be diplomatic remedies. And that's because when you leave the United States, you surrender the protections you enjoy within the United States. So somebody who is captured and detained abroad and then released abroad is inherently, immediately vulnerable to apprehension by a foreign government, whether it's the country he's in or some other country in concert with the country he's in. So wouldn't that equally be true of somebody – let's take the Hamdi category of wayward tourists or embedded journalists. The categories that Hamdi describes as the people who would be beyond legal authority to detain, and therefore there had to be some review of it. That's the way the Hamdi plurality at least conceived it. Sure. So if you had somebody who's a dual U.S. foreign citizen, travels abroad, and it sounds like your submission is that if they get – come into U.S. hands abroad, then – and let's just say that they're just a wayward tourist – that still they would have no claim as against transfer because transfer is the same thing as release, and they'd be seeking release, and so then they couldn't object to the transfer. Right. So I don't think – no, no, we're not going that far at all, Your Honor, because I think what we're doing – we're saying is in the context of MUNAF, and there's a lot of things that were going on in MUNAF that I think are all basically the same here. In that circumstance, this authority – I don't think there needs to be a specific sort of legal authority, but this sort of authority exists, and I think that's what the Supreme Court was talking about. Which authority? The authority to transfer. So we're not making the assertion – I'm also talking about the authority. No, no, I understand, Your Honor. We're not taking the position that that authority is plenary because release is tantamount – transfer equals release, therefore transfer is release, therefore we can do this whenever we want, wherever we want, to whoever we want. That is not – that's not what we're saying here, and I think there are going to – there could be hard questions, though, at the margin of this authority for those reasons, but we're cabining our – I guess I'm trying to understand why isn't it that what you're saying, because if we're just hypothesizing a wayward tourist – I can't remember the exact words used in Hambi, but something like wayward tourist, but – We'll stipulate. Yeah. If it's a wayward tourist and they get picked up on what everybody conceives of as a zone of hostility, then – and the U.S. wants to transfer them, and they're dual citizens. So they fit a lot of the boxes that we're talking about. Then it sounds like your argument is that because what they're complaining about is transfer and because release is tantamount to transfer, there's no habeas review of the transfer. Why isn't that what you're saying? Because I think what we're saying here is that – what we're saying here is that there could be habeas review of whether the country that we're transferring somebody to has a legitimate interest, at least whether the legal – deciding what constitutes a legitimate interest. And I also think that there could be – So then I'll stipulate to that. Let's just suppose that it's a case in which the country has what the executive views to be a legitimate interest in the person. Right. Then I think there could also be a role for the courts in assessing whether the preconditions to this authority exist. And I think we've tried to generalize from Munoz a pretty narrow rule in which that authority exists. And one of the factors that I don't think is present in your Honor's hypothetical that I think the court could rely on in ruling for us here is that we've made a good-faith determination here that this person is an enemy combatant. And that changes this from the hapless aid worker or whatever that we've come into custody of and for some reason want to transfer. I also would just submit that – So you've made a good faith – a lot turns on the language then, because I think we've boiled it down to a good-faith determination of enemy combatancy. So if that's the question, and suppose that the government had a legal view, and I know the government wouldn't do this, but suppose that the government had a legal view that an embedded journalist who's found in a zone of hostility is subject to detention under traditional war powers and so is effectively an enemy combatant. Then that's something that you say could be reviewed, even if the person was seeking – I'm sorry, say that again, Your Honor. Suppose that they're an embedded journalist. I got all that stuff. Yeah, yeah. That's something that you say could be reviewed, even if what they're challenging – I certainly don't think you have to take that off the table in this case. I think we could have a discussion in that circumstance about what the scope of judicial review would be. But we certainly are not asserting – I don't think the authority we're asserting in this case requires going nearly that far. I guess my point is simply this, that if we were to reach the conclusion that that is something that could be reviewed – and I take your point that that's a different case. We wouldn't have to reach it in this case. But we're trying to draw lines and figure out what the implications of a ruling would be. If we're trying to carve that out and say that that's something that would be reviewed, then it seems like what's happening is that there the authority to detain and authority to transfer questions become the same because the authority to transfer is predicated on an authority to detain, and the authority to detain is predicated on whether it's true that there's an authority to detain an embedded journalist. Right, so I think I would disagree with Your Honor in this respect because in Munaf itself, you know, the petitioners in Munaf could have been embedded journalists, right? And they said they were translators, not journalists, but they said they were completely innocent people. And the Supreme Court said they had no right to judicial review of that determination. And then Kiemba, too, I think applied that in a broad circumstance. And so I guess what I was – when I was answering Your Honor's question, what I was thinking is, you know, in the general case this is not going to be reviewable, but it's possible that at the fringe, at the margin, there could be a role for the courts to play where the executive branch's determination is just facially absurd. But I thought – what I think in Munaf, the reading of Munaf, which maybe you disagree, is that everything that mattered to the Supreme Court was undisputed, which is that – which is to say that even the detainees in Munaf, Omar and Munaf, didn't dispute that the reason Iraq wanted to hold them is because they wanted to prosecute them. And that's – and from the Supreme Court's perspective, that's all you need to know. Once we know that a foreign sovereign wants to prosecute somebody for alleged crimes committed on their soil, the authority to detain and therefore to transfer exists. No, that's right, but I think your hypothetical presupposed that we had determined that the person was an innocent journalist, and that's not something that Munaf confronted at all. In Munaf, the government had obviously thought that the petitioners were what the Iraqi government believed they were, at least that there was sufficient evidence to try them criminally. And so I think it's just a different case when you're talking about one where the government itself believes and has determined that the person is an innocent journalist. That's just a different – very different circumstance than what we're talking about here that I think certainly distinguishes it from Munaf and really raises a lot of difficult questions that aren't presented in this case, because I think all the predicates I mentioned – I forget in answer to whose question it was in response to, but are undisputed here. Well, one thing is not, which is that you're – the way you drew the line, I think, is good faith determination of – is a determination of – That was one of our factors yesterday. Yeah, so and the – kind of when we spun out what we were talking about a minute ago, we arrived at good faith determination of enemy combatancy. And let's just assume that there is that here. The claim that's being made on the other side is it's still an incorrect determination of enemy combatancy, not as if it's being made that actually this person's not an enemy combatant, they were a journalist. Let's put that to one side and assume the government's right about that, either that the government's correct on the facts or that that's unreviewable. There's a legal proposition that's being put forward, which is that in order to be a correct determination of enemy combatancy for purposes of detention, you have to conclude that the AUMF applies in this context. That's a legal question that's at issue. And that legal question could be seen as not meaningfully distinct from the legal question of whether there's an authority to detain someone because they're – on the basis of – that they're an undetected journalist. Right. So at the beginning, I disagree that – I don't think the court needs to get into all of this, but I think if the court – even if the court thinks that this is relevant on some level, I think then there's a question about the authority to do things in the theater of battlefield operations and whether they're judicial reviewable as compared to the authority to detain someone until the end of active hostilities under Hamdi. And I think the latter – the latter type of authority is fairly specific and fairly specific to helios corpus. And I think – I think, you know, there's certainly a difference between that type of authority and the authority used to do all the other things that are happening in Iraq and Syria right now. So we certainly don't think the court needs to try to figure out – basically put the cart before the horse and figure out whether we would win the habeas proceeding on the merits, either as to the legal basis or the factual basis, in order to figure out whether we're allowed to relinquish custody of Petitioner Now to one of the two countries that we'll talk about soon. And can I just get your clarification on one line of argument that you discussed a few times, which is if one were to read – I'm not saying this is the way I read it, but if one were to read Manaaf as validating detention on the idea that, based on the undisputed facts there, the detention was for the purpose of potential Iraqi prosecution, and that's a valid basis of detention, and therefore we're signing – we, the Supreme Court, are signing off on authority to detain in that circumstance. And we just get the authority to transfer based on the predicate that there is an authority to detain. Then you have a further argument that even if that's how one were to read Manaaf, that Kiemba kicks in and does something more. And I just want to make sure I understand that argument. Well, I think Kiemba just applies Manaaf to a very different circumstance, which is a detainee who, like Petitioner, is being held in U.S. custody. And, in fact, in Kiemba, the U.S. didn't even believe they were enemy combatants anymore. Right. And that was the whole point. That's why we were trying to transfer them. Who doesn't want to go to the recipient country? And this Court, I think, was very clear that there's no basis in habeas corpus to interpose the courts in that transfer, because the detainee is worried that he's going to be detained further in the receiving country. So that's true. So let's just say, because what Kiemba has is a structure where it says there's two bases of potential objections here. One is fear of torture in the recipient country, and one is prosecution or continued detention in the recipient country. They both have to do with objections about what's going to happen in the recipient country. They didn't have to do with detention, continued detention, at the hands of U.S. authorities here. That was just kind of put off the table. Because the government conceded it didn't have authority to detain. Right. But I think that answers Your Honor's question, right? So there was no authority to engage in continued detention in Kiemba II. That was the point. And yet the Court found Munoz to be controlling on these questions about the scope of the authority to transfer. That's true. So if Kiemba stood for the proposition that, therefore, there's never any review of the basis for detention because it was conceded there that there wasn't a basis for continued detention, that would be one thing, and that would be very much to your benefit. But I guess one way to look at Kiemba is to say that what it was about was a situation in which nobody was asking for release, because that just wasn't available because these individuals didn't have any authority to be released, either where they were being detained into Kiemba or an authority to be released into the U.S. because they were aliens. The release just was off the table. All we're talking about is a practical accommodation of what to do with individuals who can't be released. They have to be transferred, and we're just talking about where they can be transferred. Whereas one could say that in a case like this one, the question of release actually is on the table because they are, the individual is a United States citizen, so the possibility of release, in fact, exists. I guess I would just, I'm sorry? Does that make sense? Is that a potential basis for a distinction? And if it doesn't, why not? So I just, I don't think, because I guess I would say that the Court's opinion in Kiemba 2 doesn't, the Court's opinion in Kiemba 2 is not limited in the way that Your Honor has suggested, even though I think Your Honor has proffered a factual distinction of Kiemba. The guy, Peter Zinke in Kiemba, I think, did actually want to come to the United States. Now, obviously, there's a distinction because they were not U.S. citizens. But, of course, the Court assumed that they had all the same rights as U.S. citizens in footnote 4 as the U.S. citizens in Mudah. So I think when the Court says that, I mean, I think it's sort of taking this distinction off the table. Well, they had the same rights vis-a-vis objecting to a transfer to a third country based on the conditions of that third country. Right. They didn't. I mean, I don't know that the footnote has to be read to say they had the same rights vis-a-vis release because everybody agreed in Kiemba that release, at least release into the U.S., was not even. No, I know, but I think, I thought, I took Your Honor to be linking the two and saying that the ability of release changes the scope of the authority to transfer. And so I guess I'm just saying that if that were what the Court had meant in Kiemba 2, I think it would have just been written differently and wouldn't have equated the petitioners in front of it with U.S. It wouldn't have said it was assuming they had the same rights as U.S. citizens because if they were, in fact, had the same rights as U.S. citizens and it was, in fact, significant that that would then mean they could be released in the United States, then that would have changed the whole analysis under the line of reasoning I think Your Honor has suggested. So if there's no more questions, I'll be back soon. We'll give you some time for rebuttal, too. Okay, thank you. Yeah. Good morning, Your Honors. May it please the Court. It's a little difficult to respond because the government has shifted positions multiple times. They've shifted from what they told Judge Chutkan initially, they've shifted from what they told this Court from their initial brief in their reply brief, and now they've shifted their argument. But what they presented to Judge Chutkan was this, a blank check to render, forcibly render, an American citizen to any country the executive deemed had a legitimate interest in him without positive legal authority and without any judicial review whatsoever. In fact, they told Judge Chutkan, and this is at page 18 of the transcript from January 18th, it's not in the appendix, it's in the docket, it was none of her business, that it was not their burden to tell Judge Chutkan where they would be sending him. Now, in light of this – I'm not sure I understand this argument because it seems like it's just within the ken of parties in litigation all the time to narrow the scope of issues, and that's an understanding of what the government is doing, is that they're saying whatever was the case below and however this is teed up, we're seeking to narrow the scope of the issues, and one way in which we're seeking to narrow the scope of the issues is basically, and it operates in your favor because it's essentially a concession, that we're not disputing the validity of the order that we're challenging with respect to any countries other than the two that remain on the table. And that just seems like that's within the ken of what parties do all the time to narrow. I don't want to belabor the point, Your Honor, but just two brief points on that, one of which is neither of the countries were provided to us in the district court and only one of them was provided to Judge Chutkan. And second, just in terms of the Judge Chutkan's exercise of her powers, it was in light of this sweeping position that she entered an exceedingly narrow order, requiring the government to provide nearly 72 hours' notice, literally the minimum notice to provide petitioner with an opportunity to challenge the basis for his transfer and for the court to review that transfer. And this notice requirement serves, preserves judicial review for two critical functions. One is which to determine whether there is positive legal authority to transfer an American citizen, and then secondarily to ensure that it's not an extreme case to preserve review in the case of an extreme case in which the executive is transferring a citizen regardless of the risk of torture, both of which require prior judicial review. On the positive legal authority point, this is a critical point, as Your Honor noted. How is the second issue even before really in this case, the torture issue? Your Honor, we... Given Munoz, Kieva, and the representations made by the government about their policies in this case, how is that issue even really present and on the table as far as something that can be reviewed? I'll answer briefly, and then I think it might be better to defer that to the closed session. But at the point, it's not the focus of this case. The main focus is authority. But the government says that we didn't raise anything about the risk of torture because we didn't know to what country the petitioner might be sent. That wasn't identified to us. And in Munoz, it preserved... In Munoz and in Kieva, too, preserved the exception for the extreme case. And in Munoz, there was evidence specifically that the Solicitor General pointed to and that the court noted about the specific facilities that they were going to be transferred to and whose authority they were under. But I want to... If I may return to positive legal authority, because I think that is critical. As this court recognized in Omar II, and as the Supreme Court has recognized multiple times, there has to be positive legal authority based on the due process clause and the separation of powers to transfer an American citizen. That positive legal authority can take different forms. It can take the form of an extradition treaty, if someone is being transferred to a different country for criminal prosecution. It also can take the form of international agreements during wartime, such as the Geneva Conventions, potentially. Or it can take the form of a treaty that authorizes the executive to enter into particular agreements. And I would call Your Honor's attention to Wilson v. Gerard, cited on page 33 of our brief, dealing with a U.S. citizen, military prisoner, who was being committed a crime in Japan and was... I think to the case, and speaking of sweeping positions, I mean, your position in the district court, and appears to be in this court, is that there is no positive legal authority for him to go anywhere. That their only option is to release him or bring him to the U.S. and charge him with a crime in an Article III court. Isn't that your position? Our position is that the government has not identified, at this point, any positive legal authority to transfer. Do you think Article II is legal authority? No, Article II is not legal authority. Article II is a source of constitutional power. But it has to be this... When we're talking about the liberty of an American citizen, it has to be... all three branches have to be involved. It has to have some... it has to root itself to some source of positive authority, either a statute or a treaty. The Supreme Court, Your Honor, has never held. Whatever foreign affairs power the President might have, it has never held, in any case, that the President has, under his Article II power, the authority to render an American citizen to another country without legal authority. Let me ask you this. He's detained in Syria and then transferred and further detained in Iraq. Was there positive legal authority for him to be moved from Syria to Iraq? Well, no, Your Honor. We don't think there is because he's not... So we should release him right now? Well, the only possible positive legal authority, that would be the same legal authority, I think, to continue to detain him, which is the issue in the habeas case. That is, if he were, in fact, an enemy combatant, as a matter of fact, in a matter of law, they would have the authority to move him within U.S. custody or to continue to detain him. He's disputed that vigorously, and that is presently before the district court. So the power that they have over his body now, over his corpus, is their assertion that he's an enemy combatant. He's disputing that, and for that reason, we are arguing he should be charged or released. But it's not that your argument is that even if we assume that he is an enemy combatant, let's suppose a situation in which you couldn't dispute that he's an enemy combatant. I know you do dispute it, but let's just suppose that you couldn't. It sounds like your legal argument is that even if it's somebody who's undisputedly an enemy combatant, if they're an American citizen, then there's no authority to transfer based on enemy combatancy. Period. There's just no authority to transfer. That sounds like that's your legal argument. Well, the argument they would still have, as an American citizen, they would still have perhaps in the Geneva Conventions or somewhere else to transfer him. But the authority is simply that he's an enemy combatant. So that's predicated on him being an enemy combatant. And your argument is that that's not enough, that an American citizen who is validly, factually, and legally validly determined to be an enemy combatant, nonetheless can't be transferred by the military to another country. Your Honor, we still believe there needs to be a positive authority, but that question is not before us. I think you're – it sounds like I'm going around in a circle, because what I'm saying to you is the hypothesis is the positive legal authority is the determination that he's an enemy combatant. And the idea would be that once you've made the determination that an individual is an enemy combatant, part and parcel of that authority, just like the authority – let's start with this proposition. Once an American citizen has been validly determined to be an enemy combatant, I take it you wouldn't dispute that there's the authority for the U.S. to detain him as an enemy combatant? If they have authority to detain him, yes. If he's an enemy combatant, they would have authority lawfully to detain him. Right. That's – there's cases that contrast that. Yes, correct, correct. So then the proposition would be that part and parcel of detaining somebody as an enemy combatant in connection with an ongoing conflict is transfer, because that's just something that's always happened in history with people who are detained as enemy combatants. It's part of the give-and-take of warfare is that countries are exchanging prisoners. They're engaging in these sorts of actions all the time as part and parcel of warfare. So just like there's the authority to detain somebody who's validly determined to be an enemy combatant, there's also the authority to transfer someone who's validly determined to be an enemy combatant. But it sounds to me like your legal position is that there's just a bar at transfer. A United States citizen simply can't be transferred based on enemy combatancy. Well, you wanted to go – I mean, that's – the government is not disavowed in their brief that they're relying on his enemy combatant status as a basis. I'm just asking you to answer the – we can talk about what the government has left open and has not left open, but I'm just trying to understand the contours of your legal position. And I think following on what Judge Wilkins was asking, is your legal position that even if you have an individual who's an American citizen who's been validly determined to be an enemy combatant, that there's no authority to transfer that person? That authority could exist under the law if he was subject to the laws of war and he was validly detained under the 2001 and 2000 AUMF. That could certainly potentially be a basis for transfer. That would be a very different case, though, Your Honor, because they are assuming – to the extent that they're relying on his enemy combatant status, which they seem – again, it seems to be a moving target. To the extent they're relying on his status as an enemy combatant, they're assuming the answer to the question. And what the Supreme Court said in Hamdi was a good faith basis is not enough. That's essentially what the U.S. government told the Supreme Court, and eight justices on that point rejected that when it comes to the liberty of an American citizen, a good faith basis is not enough. It's not enough to trust the executive branch. There has to be judicial review. And so if there has to be judicial review, the United States can't circumvent Hamdi by relying on his enemy combatant status or the claim that he's a battlefield detainee without an opportunity to attest that, and then using that power to forcibly transfer him without legal authority. So I think part of the government's submission is that that's looking at the wrong question, because after Munoz, what we know is that even if there's a dispute, an assertive dispute about the validity of detention as an enemy combatant, that's just off the table when you get to the question of whether the person can be transferred. Because Munoz and Omar contested whether they were innocent civilians or enemy combatants, and the Supreme Court didn't care about that. They went ahead and authorized the transfer, even though there was still an ongoing open dispute about whether the individuals were enemy combatants. I think Your Honor covered that question in your questioning of the government, but I would like to add one point there, which is that there was no remedy available in Munoz. As the Chief Justice said in Munoz, the last thing the Munoz petitioners want is release. There was simply no remedy. So the court did two things in Munoz. It refused to bar their transfer because they were being prosecuted in Iraq, and secondly, it said because they are being wanted for crimes that they – being prosecuted for crimes that they committed in Iraq, while in Iraq, there was no basis for habeas relief. So there was no relief that the court could provide, and so it dismissed the petition because there was no available remedy in Munoz. The only remedy would be releasing them into Iraqi prosecution or smuggling them out of Iraq to, quote, the Supreme Court because they were wanted for prosecution in Iraq. So there was no remedy available. Here, our client has been held for over six months. He hasn't been charged with a crime by the United States or by anyone else, and there is a remedy available. In fact, as the government says on page six of its reply brief, there's a remedy that would fully vindicate his habeas rights, freeing him at a safe location in Iraq. And were that not possible, or there's also the remedy, as the court noted, that he could be brought to the United States, a remedy that was not available either in Munoz or in Kanba. Can I ask you this question as a practical matter? So suppose somebody is detained on the battlefield in the context of ongoing hostilities, and they claim American citizenship at that point. Is your position that if that person then can't be transferred even immediately on the battlefield, that the minute that American citizenship comes into play, then essentially what happens is there's a duty on the part of the United States to continue to detain that person to allow a habeas claim to be ventilated? Certainly once the United States has determined that person's status and there's habeas jurisdiction, the court has the authority to review the legality of the detention in order to release, if appropriate, or to prevent an unlawful transfer. Whether there's a space before a court is involved in what might happen is – I mean, it's simply not before this court about what might be done. But I would say as a – I mean, the United States government would have a duty as to its own citizens. Well, let's suppose, in Judge Srinivasan's hypothetical, he's allowed to make a phone call, and he makes a phone call to the ACLU and says, they've got me, I'm on the battlefield here in Syria, and they say they want to take me to Iraq, file a petition, and you file a petition. What's our authority? Well, the authority to hear the petition is the authority that's under the court's habeas statute under Supreme Court decisions such as Hamdi that, you know, that when a U.S. citizen is in the detention of his government, the writ reaches them. He's in custody, but the argument is I don't want to be moved to Iraq, and that's before some U.S. district court judge on an emergency habeas. What's that judge to do? I think – just so I understand, I think it would be different – it's a different question if the U.S. picked that person up and then they wanted to move them to Iraq, as the government says in this case, and hold them there because that's a safe place to hold them. I think that would not – that would be different than if they were – that would be – then the court would decide the habeas petition would be litigated in due course. So there would be no – I don't think there would be a role for – there wouldn't be no role – excuse me – there would be no role for the court if the United States picked someone up and moved them to a U.S. prison and held them in the military prison there. That decision to move them to a U.S. prison, that's within the purview of the executive branch. If the United States were at that point to seek to transfer that citizen to a different country, there would be review. I mean, so there would be – there's no review about – Which requires continued detention, right? So then the position would be that even in the immediacy of a battle to capture, that the minute that the citizenship becomes apparent and the person makes the phone call that's hypothesized by Judge Wilkins, that then there's essentially the obligation on the part of the United States to continue to detain him to facilitate the litigation of the habeas claim. No, I mean, certainly the United States could release the person.  I mean, while they litigate the habeas petition, if they file the habeas – Well, sure. I mean, I understand the release option. I'm just saying that in terms of transfer, there's no ability to transfer. Involuntarily, no. By hypothesis, the government obviously doesn't want to release the person because they have a legitimate good faith belief that the person's an enemy combatant. But your position would be that even if all this happens in the immediacy of the battlefield, that once there's a capture and an assertion, that then there's either release or has to be continued detention, no ability to transfer even on the spur of the moment determination? In the case of an American citizen, with a habeas petition that's been filed, there is no authority to – well, there might be authority. They might be transferring them pursuant to legal authority, but that would be subject to review. We're not – our position is not, to be clear also, that the United States cannot transfer Doe. It's just they cannot transfer him involuntarily without legal authority and review of that authority. So it doesn't matter, you know, at what point in the continuum. That option is not on the table for a U.S. citizen. So if the United States takes someone, captures them on a battlefield, if they assert, as they've asserted here, that he's an enemy combatant, they can continue to detain him on that basis, subject to judicial review, under Hamdi and other Supreme Court precedents. They can release him. They can charge him with a crime, which they haven't done, or they can transfer him pursuant to valid legal authority and subject to review. They can't forcibly render an American citizen without some source of authority. It has to go back at its root. This goes to Your Honor's Article 2 question. I do want to make sure I answer that. It has to – the Supreme Court said in Munaf, this court made clear in Omar 2, Wilson v. Girard, the Supreme Court said there it has to trace itself back to some source in positive law. It'd be a statute, as it was in Munaf. It was the 2002 AUMF, which authorized the United States to enforce Security Council resolutions in Iraq, which included acting essentially as Iraq's policeman and jailer. I would point out, Your Honor, Judge Randolph's concurring opinion in Munaf, in the D.C. Circuit, where he discusses that, and page 25 of the Solicitor General's brief to the Supreme Court. That's where it's most crisply detained. So it could be a treaty or a statute authorizing the executive to do something, but it has to go back to find its source in positive law, in some kind of – something that Congress has approved, either through a treaty or through a statute. As the court said in Hamdi, when the liberty of a citizen is at stake, all three branches have to be involved. And that's whether the United States wants to detain a person indefinitely as an enemy combatant, or whether they want to dispose of the liberty by forcibly transferring that person to another sovereign. Does the congressional authority that you're hypothesizing, the congressional engagement on this, have to deal specifically with transfer? Or is it just that as long as we're in a situation in which the executive is waging war, then part and parcel of that authority to wage war is the authority to transfer? Well, I think that goes – in a sense, that goes back to the question Your Honor was asking me before. The answer is potentially. Like, I think it would have to – I think for an expedition, it would certainly have to face charges. It would have to spell out the source of authority. It would have to spell out the transfer provision. If there was some kind of power over to detain enemy combatants, it is possible that the court – if the person were found to be an enemy combatant, that the transfer authority could be potentially inferred. But the government is not relying on anything. They've not provided any statute or any treatment. So what is the government relying on is Kiemba. And in Kiemba, there was no ongoing authority to detain by assumption of the government because the conclusion had been reached that the individuals were not enemy combatants. And yet, even though there was no authority to detain, there was still a validation of the authority to transfer. The idea that transfer could be had was not disputed. So how does that – how do you deal with Kiemba given that in Kiemba, you're dealing with a situation in which there wasn't an authority to detain to begin with? Well, as Judge Kavanaugh said in his – noted in his opinion in Kiemba, Kiemba 2, that case dealt with the transfer of noncitizens, wartime alien detainees who by longstanding practice could be repatriated to their home country or to a safe third country either at the conclusion of hostilities or after there was no longer desire to detain them. And there was no basis for – there was no remedy available in Kiemba 2 because they couldn't be released at Guantanamo and they couldn't be released in the United States because as this court said, the determination with regard to aliens is – the admission of aliens is a political branch determination. So there was no – as in Munaft in that sense, there was no habeas relief available because there was no possible remedy. There was no – there was nothing the court could do in terms of providing habeas relief, which is release from custody, which is what we're asking for here. I want to just make sure I'm clear on a record and factual question. Correct me if I'm wrong, but I did not see anywhere in your petition or anywhere in your response to the factual return that was filed by the government an assertion and a pleading that Doe was not an enemy combatant. Your Honor, we dispute that. It's on – I think it's page 1 or 2 or 3. One of the – I think it's on page 2 and 3 or 1 and 2 of our – of the response to the petition, of the – to the return, where we – where Doe disputes the central allegations the government has proffered, specifically he asserts that he traveled to Syria as to learn about the conflict, report about the conflict. He was tortured, captured and tortured by ISIS while he was in custody and then taken into custody there and that he sought his relief and he was fleeing the violence there when he was taken into custody by the Kurds and then taken to the United Americans. And in no time does the government even assert that he was a – that he took part in hostilities against the United States or committed any violence. It's at page 97 and 98 of the appendix. Well, 97 says petitioner accepts the government's allegations about him as true for the limited purpose of this threshold challenge and has reserved his right to challenge those allegations at a later stage and then says that there's some inaccuracies, et cetera, et cetera.  That's correct, Your Honor. He accepted the allegations for purposes of challenging the government's legal authority to hold him because if there's no legal authority to hold him, which we claim there's not, which is before the district court, there's no – the facts are irrelevant. So it's essentially a – But if his status as an enemy combatant – I guess to get back to Judge Trinovaso's line of inquiry – is a source of legal authority and you kind of assume that for the sake of argument for the position that you take in the district court and kind of where we are here, then I guess we're kind of like a dog chasing its tail here or something. You put us in a – you have assumed for the sake of argument the fact that's true that might be the positive legal authority that the government needs. And I guess I'm trying to get you to respond to that conundrum or how we should deal with that litigation posture that you are taking. We assumed the truth of those facts solely for the limited purpose of his challenge to his detention. We did not assume the truth of those facts for purposes of his transfer, and the government is not relying on that. They disavow that they're relying on his status as an enemy combatant to transfer him. If they were – Maybe we will rely on it. Well, I think then, Your Honor, that would be inconsistent with Hondi because he's – well, first of all, he's reserved his right to dispute the facts, but he's challenged the government's legal authority to hold him. So in order – if this court were going to decide that the government had legal authority to transfer Doe, assuming the facts were true, under the AUMS, it would need to decide whether he was detainable under the AUMS, and the government has not relied on that. If the court wishes to have further briefing and a separate hearing to discuss that issue, we're prepared to do that. But we've tested both the legal and the factual basis for his detention. The government is not relying on his status as enemy combatant. So he is exactly like the journalist that Your Honor hypothesized about, the CNN or MSNBC journalist that could be sent to Siberia. They're not relying on his status as an enemy combatant. And if they were, that would be improper because they would just be assuming the answer to the question in the habeas. But what processes do then? to challenge that determination? With respect to his detention or his transfer? Either. Well, with respect to his detention, it's the process that was laid out in Hamdi, which was a challenge – the challenge of encompasses first, challenges the government's legal authority, right, to do the statutes that the government is relying on, cover the person in question. Is there independent Article II power to detain? We say there's not. And even if there is, is there a factual basis for that detention? Is there a – after, based on the Matthews v. Eldridge balancing test, a meaningful opportunity to be heard and to test the facts, is there a factual basis that the person isn't an enemy combatant? It's not enough simply to trust the executive or a good-faith basis. That's what the Supreme Court rejected in Hamdi. Are you drawing a distinction between detention and transfer because in response to Judge Wilkins' question, you asked, are you talking about authority to detain or authority to transfer? Your position is that – do you see a difference? I thought your position was that in order to have a transfer, you'd have the authority – you need the authority to detain to begin with, or is that not your position?  I'm not saying, but as in Munaf, there could be – the authority to transfer could be separate from the authority to detain. In other words, like in Munaf – You need more authority to transfer. You need at least the same authority to transfer as you do to detain, but you might need more. Is that where – is that your – No, it's a different source of authority. It's a different source of authority. It's like, for example, it could be an extradition treaty, or it could be a – as in Munaf, a statute that implemented an international agreement that allowed for the transfer. Or in Wilson v. Girard, it was a security treaty that authorized an agreement between the United States and Japan over which country should have jurisdiction over crimes committed by service members. So it's – I guess, yeah, I understand your point. I guess I'm hypothesizing a situation in which the authority that's being asserted is the detention as an enemy combatant, not in order – not continued detention for some other reason like potential prosecution for crimes committed in the country to which the person would be – to his custody, the person would be transferred. If there – if it's detention – if they're relying on the same – if the government is relying on the same power to transfer that it is to detain, then absolutely you need to find out whether the detention – the court needs to establish that the detention is proper, right? If the government wants to transfer him based on his status or their good faith determination that he's an enemy combatant under the AUMS, the court then would first need to find that he is, in fact, an enemy combatant. And so if that's the basis the government's relying on, then the government is free to present that argument to the district court, and the district court can adjudicate if he's an enemy combatant. And then if he is an enemy combatant, that may well – that may well justify his transfer. Yeah, so this goes back to where we were at the beginning of the argument to some extent. But – so any time the government wants to say we're detaining somebody who's an enemy combatant, we pick them up on the battlefield, they were engaged in hostilities against our troops, and they're claiming U.S. citizenship, you're – and we want to transfer them in the give and take of warfare to a different country, your submission is that the HMDI process for legality of detention is required in every instance in which that's the case, that you have to go to – but short of release, you've got the caveat of release. But short of release, in every instance, the person is entitled to the HMDI process before they can be transferred. If the basis for detain is enemy combatant, yes, that's correct. Because otherwise, Your Honor, it would leave – it would present the – and the rule the government is asking for – they try to obscure it, but the rule the government is asking for is that if they determine someone is a battlefield detainee – a reporter, embedded journalist, errant tourist, to use the language from HMDI – if they determine that person is a battlefield detainee, then the government has unilateral and unreviewable authority to transfer that person to any country in which they determine has a legitimate interest in him, even if they're a citizen. The plurality in HMDI said this at 534. The parties agreed initial captures on the battlefield need not receive the process we have discussed here. That process is due only when the determination is made to continue to hold those who have been seized. So for detention purposes, it seems like the plurality in HMDI was drawing a distinction between captures and immediate detentions in battlefields and continued detentions. And why wouldn't the same be true of transfers? That if you have a capture and immediate battlefield determination or something – I mean, I don't know what the exact timeframe is, but presumably the military has some discretion in determining how to deal with people they pick up on the battlefield – that there could be a determination made with some immediacy that under a HMDI calculus wouldn't be subject to habeas review in the same way as continued detention, which as a practical matter could accommodate this sort of review that HMDI contemplated. So I think the question – the answer boils down – the answer to your question boils down to when habeas rights attach. Once habeas rights attach, and once – I might attach, but then the question would be what processes do. And the way I understood the plurality's statement in HMDI is that you could draw a distinction between something that happens in the immediacy of the battlefield and something that becomes continued detention. And I guess my question is, could one draw the same kind of divide with respect to transfers? Yes, I – well, I think that's what the passage in Handi suggests. The question – well, here it's possible that Your Honor could draw that distinction. I think if there was no basis for a court to review the detention in the immediacy of a battlefield capture, there might not – there might not be a basis for a court to review the transfer. But here – and this was an issue that was explored in the district court when the court was determining whether or not there was habeas jurisdiction. And the issue is, once – what Handi says, and I think what's even – what's clarified in Bumerian, is once the executive determines the status of some individual, they put the label of enemy combatant on them, at the very latest, at that point, habeas jurisdiction attaches. And once habeas jurisdiction attaches and the court has power over the custodian and over the detainee, the detention and the forcible transfer are both subject to judicial review. So what happens if – Let me ask you one other question, which is a potential basis for distinction that hasn't been supported. This is more to get as far as I can tell, but in Justice Scalia's dissenting opinion in Handi, who – and Justice Scalia, of course, adopted a position that was, if anything, more favorable to American citizens. He drew a distinction based on where the person – a potential distinction based on where the person is being held. Because he said, where the citizen is captured outside and held – where the citizen is captured outside and held outside the United States, the constitutional requirements may be different. And that's his case, because Doe was held and captured outside the United States. And so I'm just wondering if that's the basis of drawing a different constitutional line than the one drawn in Handi in terms of the kind of protections that would be owing for the reason that Justice Scalia suggested in Handi. Yes. I mean, it was – Justice Scalia's position, the position that he was articulating there, was whether a citizen had to be subjected to full criminal process or could be detained as an enemy combatant subject to the plurality holding of the Matthews v. Eldridge balancing test. So the answer is it's irrelevant to the extent that – because for our client, who was captured outside the United States under Handi, under the plurality, Justice O'Connor's opinion, and the concurring opinion of Justice Souter, he is entitled to, at a minimum, the meaningful opportunity to challenge the legal and the factual basis for his detention. So his locus of capture matters only with respect to Justice – for Justice Scalia in terms of whether he gets full criminal process or can be held as an enemy combatant. So the holding of the court of Justice O'Connor and Justice Souter is that he gets the meaningful opportunity to challenge the factual and legal basis of his detention. And I would add also Justice – Justice Kennedy's comment in Boumediene at page 765 that the political branches have no power to switch the Constitution on and off at will by where they physically move the prisoner. So it can't, as Justice O'Connor said in Handi, make a determinative constitutional difference as to those rights because they have decided to keep him in Iraq as opposed to whether they move him to the United States. That's – it's where the military wants to hold him within U.S. custody. We can see that's a military matter, but it can't affect the rights that he is due as an American citizen. But let's suppose the military says, well, you know, Doe has contested his status, and we don't know. Maybe he is an enemy combatant. Maybe we're wrong about that. Bottom line is, though, we don't want to hold this guy anymore. And let's say for the sake of this hypothetical, you know, he can't be released in Iraq because Iraq says, we don't want you to release him here. We don't want him in our country. So the U.S. spins the globe and puts their finger down and says, okay, Namibia, they're an ally, and we call them up and they say, okay, fine, we'll take him. Why can't they just release him to Namibia, and then he can – he's released. And he can seek to return to the U.S. or he can seek to go wherever else. But, you know, he traveled out of the U.S. and went to voluntarily to Syria. Well, maybe involuntarily he ended up in Namibia, but, you know, at least he's released. Why couldn't the U.S. just at this point say, we want to wash our hands of the matter and release him someplace, and why does that particular decision require some sort of positive legal authority if there's no indication at all that Namibia has any interest in prosecuting him or anything, and he can seek to return home from there just like he could seek to return home from anywhere else? Well, the United States does not, under the Due Process Clause and the separation of powers, cannot dispose of the liberty of a U.S. citizen through a forcible transfer. Because the United States, the executive branch, has never had – there's no case in the government sites that said the executive branch can wash their hands of an American citizen, by forcibly transferring him to another country. A forcible transfer is not equivalent to release. It's not equivalent to release as a matter of law or common sense. If it was the same equivalent as a matter of law, there would literally be no extradition and no immigration case law. And as a matter of common sense, Your Honor, I'm sure I can appreciate – But he went to a place where he can't be released to that place. He voluntarily traveled there, and let's suppose it was legally appropriate for him to be moved, removed from Syria to Iraq, and Iraq says at that point, we don't want him anymore, and the military doesn't want to hold him anymore. They have to transfer him, right? Involuntarily transfer him. No, because he can, as a U.S. – that may be true as a non – if there's no possibility of release for a non-citizen, and they don't want to detain the non-citizen anymore, and they can't release the non-citizen where they are, they may have – at that point, like in Kienba, they have to find another country to send that person to. But for a U.S. citizen, has an absolute right to come back to the United States. If he has a right to return, does he have a right to have the military put him on a plane and fly him back here? Well, the district – he's been unlawfully detained, and so the district court, in the exercise of its equitable habeas powers in fashioning a remedy appropriate to the circumstances of the particular case, has the power, and has had the power for like 800 years, courts, judges, to produce the body in the courtroom. That's what happened in Kienba. The judge, Judge Urvina, ordered that the petitioners be brought, exercising their habeas powers, to D.C. That was illegal, or found to be illegal or improper, because they were non-citizens, and it conflicted with powers over immigration. This is an American citizen. There's no – I mean, there's nothing that would bar a court, if necessary, from ordering that the petitioner be brought back here. That said, Your Honor, that's a hypothetical that's not presented by this case. The government has said in its brief that release to a safe location in Iraq would give the petitioner the relief he's asking for. Our petition is simple. Doe has not done anything wrong. He believes he has not committed any crime against the United States, and he's asking merely to be charged with a crime or released. The government, after six-plus months of custody, has not charged him with a crime, nor has Iraq, nor has any other country. In this case, though, I think it's undisputed in this case that when he was initially captured, he claimed United States citizenship so that he could get the protection of U.S. forces, right? He identified himself as a U.S. citizen, correct. Yeah. And so I take it that when someone does that, they assume that – what they don't – I don't think they're necessarily assuming that the U.S. is going to come and protect me as a U.S. citizen and then, you know, necessarily keep me right where I am or keep me right where I am but then give me some – a Secret Service detail to protect me as I go where I want to go. Well, I think what they're asking for when they assert U.S. citizenship is, come take me somewhere. So it's necessarily presupposed that he was going to be moved to the U.S., right? So it's part and parcel of his claim of U.S. citizenship was that he was going to be taken somewhere. It wouldn't necessarily mean take me back to the U.S. It just means take me – get me out of here. Take me somewhere, and that could be wherever the U.S. decides it's appropriate to take me. Isn't that necessarily what's going on in a situation in which somebody asserts the United States' citizenship in a context like this? Well, he asserts his citizenship. He asserted his rights of protections of U.S. citizens, sacred protections, and then he was brought by the United States to Iraq. He's been detained now for six months. He's not – his claim is he's not asking – the petition does not ask to be released in the United States. It's simply to release Simpliciter. It's the polar opposite of Munaf, Your Honor. He's asking to be – for the United States to open the jailhouse doors and let him go. They could not do that in Munaf because the petitioners there were being prosecuted for ongoing criminal charges. They were literally being brought by the United States, the multinational force, to the Iraqi court every day, and the court enjoined that, the lower courts enjoined that, and they halted the trial. He could not be released. The Munaf petitioners could not be released in Iraq. We are simply asking after now six months of detention that he be freed. The United States doesn't have the power to forcibly transfer him to another government, and so he was asking for the protections of the United States. He did not – he was not – by virtue of claiming his U.S. citizenship, he was not inviting the United States to render him to any country it deemed suitable without any kind of review. He's not – he claims and maintains he has not done – committed any crime or done anything wrong. No one's charged him with a crime and there's no barrier to his release. Thank you. Thank you, Counsel. It's customary in this situation that we ask whether appellant counsel has any time remaining. I think we know the answer to that. But we'll give you three minutes for rebuttal anyway. Your Honor, I think it might be more useful for the court if we just move to the sealed proceedings. That's fine. If that's okay with Your Honors. Yeah. Thank you. That's certainly fine with us. Okay, we'll take a recess while we go into – and then go into closed session.
judges: Henderson, Srinivasan, Wilkins